[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
Quincy Amusements, Inc.("Quincy") filed this real estate tax appeal challenging the assessor's determination of the value of its property located on Red Stone Road in Manchester on the grand lists of October 1, 1998 and October 1, 1999.
The subject property consists of three contiguous parcels of land totaling 14.45 acres: 51 Red Stone Road ("lot 51"), which contains 6.05 acres of land; 61 Red Stone Road ("lot 61"), which contains 0.77 acres of land; and 99 Red Stone Road ("lot 99"), which contains 7.63 acres of land. Lot 99 is improved with a building containing a sixteen screen, 3597 seat megaplex movie theater. All three sites contain paved parking for patrons of the theater.
The function of the court in this appeal is to determine the fair market value of the three parcels as of the last town-wide revaluation date of October 1, 1990. On October 1, 1990, the subject property was located in a B-III zone located on the north side of Red Stone Road, east of Buckland Street and south of a right of way backing up to the eastbound travel lanes of Interstate I-84. A B-III zone permits movie theaters, retail stores and shopping centers, personal service facilities, financial institutions, office, business or professional use and hotels and motels. CT Page 15514
On October 1, 1990, the subject property was unimproved land owned by Brentwood-Manchester. In 1991-92, a Builder's Square home improvement warehouse outlet was constructed on lot 99. The building contained approximately 90,000 square feet of gross building area. An outdoor garden center was located off the east wall of the building. The Builder's Square outlet was closed for business in 1995.
On November 26, 1997, Community Centers Three LLC conveyed lots 51 and 61 and two other lots to Quincy for a price of $3,000,000. On the same date, Quincy conveyed the two other lots for $100,000, leaving Quincy with lots 51 and 61. On the same day, Kmart Corporation conveyed lot 99 to Quincy for $6,850,000. The total amount paid by Quincy for lots 51, 61 and 99 was $9,750,000.
After Quincy acquired the subject parcels, it renovated the former Builder's Square building to adapt it as a megaplex theater. The interior of the former Builder's Square building was completely changed to accommodate a sixteen screen theater containing a total of 3597 stadium style seats. By industry definition, any theater with more than thirteen screens is known as a "megaplex theater." In addition to doing a complete renovation of the interior for theater use, the roof of the building was raised in the center to create a more spacious lobby and front facade. An extensive mezzanine area of 21,690 square feet was constructed to house the projection equipment for all of the auditoriums in the building. Portions of the site not already paved were paved and re-striped or reconfigured. The total cost of the conversion of the Builder's Square building to a sixteen screen megaplex theater was $5,300,000. The total acquisition cost for Quincy, consisting of the purchase price of the three parcels and the renovations, was $15,050,000. The certificate of occupancy for the theater was issued on June 16, 1998. As the plaintiff's appraiser, Robert H. Silverstein, stated in his appraisal report, "[t]he appraised facility is a new, state of the art cinema; well located except that the site lacks visibility and signage on the main roads." (Plaintiff's exhibit A, p. 94.) Beginning on the October 1, 1998 grand list, the assessor valued the land and buildings on the three lots at $13,207,299.
Conceptually, it is a difficult task to determine the fair market value of the subject property as of October 1, 1990, because the megaplex theater was not in existence in 1990. The original construction of the subject building as a Builders Square warehouse store was started in 1991, completed in 1992, then further substantially improved with new construction as a megaplex theater in 1997. Historically, we have unimproved land located in a business zone at the time of the 1990 revaluation as the first stage. Second, we have a 90,000 square foot CT Page 15515 building placed on the tax rolls on the list of 1992 trended back to October 1, 1990 and third, there were the improvements made in 1998 as new construction added to the tax rolls as of October 1, 1998 but trended back to October 1, 1990. Neither Silverstein nor the town's appraiser, Sean T. Hagearty, considered these three segments in their process to arrive at the fair market value of the subject as of October 1, 1990. Silverstein and Hagearty valued the subject property as a new megaplex theater on October 1, 1998 and trended the 1998 value back to October 1, 1990.
The three parcels of land, for all practical purposes, should be valued as a single entity. The assessor valued each parcel separately. The plaintiff's appraiser, Silverstein, was of the opinion that lots 51 and 99 should be treated as one entity and that lot 61 (0.77 acres) could be developed as a separate parcel for a commercial use. The town's appraiser, Hagearty, considered all three parcels to be collectively utilized for a sixteen screen megaplex theater. We agree with Hagearty that all three parcels should be considered as one entity. Silverstein noted that the three parcels are improved with paved parking for use by theater-goers and that the total number of parking spaces on all three parcels is not enough to meet current zoning regulations. Under these circumstances, we fail to see the merit of Silverstein's position that lot 61 could be developed separately. Taking away the parking spaces on lot 61 from use in connection with the theater would increase the noncompliance with the zoning regulations and require a variance to convert the noncompliance into a legal use.
The assessor determined the value of the subject property as of October 1, 1998; trended back to October 1, 1990 to be as follows:
 Lot 99 Red Stone Road Land $3,157,443 Outbuilding $407,057 Building $7,412,286
Total $10,976,786
 Lot 51 Red Stone Road Land $1,977,800 Lot 61 Red Stone Road Land $252,500
Total land and building for three parcels $13,207,229
The plaintiff's appraiser, Silverstein, using the cost approach, arrived at a total value as of October 1, 1990 as follows:
 Lot 99 Red Stone Road Land $1,662,000 Outbuilding $367,071 Building $4,852,191
CT Page 15516 Total $6,881,262
 Lot 51 Red Stone Road Land $1,185,000 Lot 61 Red Stone Road Land $235,000
Total land and building for three parcels $8,301,262
Using the cost approach, the town's appraiser, Hagearty, arrived at a total value for the three parcels combined, as of October 1, 1990, as follows:
 Land $5,350,000 Depreciated value of all improvements $8,652,872
Total land and buildings for three parcels $14,002,872
Although Hagearty found that the cost approach was the best approach to use in determining the fair market value of the subject property, he also utilized the income approach, arriving at a value under that approach of $10,865,000. Hagearty's final opinion of the fair market value of the site plus all improvements was $12,750,000, based upon a compromise between $14,002,872 under the cost approach and $10,865,000 under the income approach.
Silverstein and Hagearty both concluded that the highest and best use of the subject property as improved was for its existing use as a theater. Silverstein and Hagearty further concluded that although each looked at the income approach and the sales approach to value, the cost approach was the best approach to determine the fair market value of the subject property. Although we agree that the cost approach is the best approach to use in determining the fair market value of the subject property, we recognize that this case is unique because it deals with an interim valuation based upon new construction. However, both appraisers valued the subject property as if it all came into existence in 1998.
In utilizing the cost approach, each appraiser first determined the value of the land. Whereas Silverstein followed the analysis of the assessor and valued each of the three lots separately, Hagearty combined all three lots together as if they constituted one parcel. Considering the land as vacant, as it was in 1990, Hagearty determined that the highest and best use of the property would be for "a destination-driven retail use" (Defendant's exhibit 1, p. 28), and Silverstein determined that the highest and best use would be for "a secondary commercial use rather than a prime retail — commercial use." (Plaintiff's exhibit A, p. 38). On October 1, 1998, the subject land was being used to support a megaplex theater and both appraisers considered the highest and best use of the land as improved to be for its present use as a theater. CT Page 15517
As of October 1, 1990, the three lots were contiguous parcels of land located within the same zoning district. The subject property was in a B-III zone, and approved as a shopping center which requires a significant number of parking spaces to support the use for this purpose. As Hagearty notes, the Pavilions at Buckland Hills Mall was completed in 1990 and transformed the area into a dominant regional retail trade area. (Defendant's exhibit 1, p. 27.) Although the assessor and Silverstein valued the subject lots separately, we find it more credible to treat the three contiguous lots as a single entity. With this in mind, we look at the land comparables selected by both appraisers. Silverstein selected twelve site comparables, all in Manchester. We disregard eight of Silverstein's comparables because these sales were not really comparable to the subject. These eight parcels were either in an industrial zone or were too small in size to make a fair comparison. Similarly, we disregard two of Hagearty's five comparables, because one was a 1.29 acre parcel, which was one of the small parcels also selected by Silverstein, and the other was a 7.65 acre parcel located within the Manchester Parkade shopping center. We find neither of these two parcels to be comparable to the subject. We were impressed with the selection by Hagearty of a sale at Frontage Road and Webster Square Road in Berlin. This comparable, sale 5 on Hagearty's list, was a 13.78 acre parcel sold on March 1, 1990 for $4,070,000, or $6.78 per acre. Hagearty adjusted the value of this site plus 25% to arrive at an adjusted value of $8.47 per square foot. At the time of the sale, this site was approved for construction of a twelve screen multiplex theater. The facility built upon the site contained a 3101 seat multiplex theater. Although Hagearty made specific adjustments of his comparables, Silverstein did not. Silverstein indicated the adjustments for each of his comparables, but did not translate these adjustments into values other than to indicate a plus or minus adjustment.
We find it difficult to compare Hagearty's specific adjusted comparables with Silverstein's adjusted comparables in plus or minus. We find it appropriate to analyze the unadjusted comparable sales selected by both Silverstein and Hagearty, which we deem credible, to arrive at a square foot value for the land. We find it appropriate to combine Silverstein's sales 6, 7, 9 and 10 with Hagearty's sales of 1, 2 and 5, recognizing that sales 1 and 2 of Hagearty's appraisal and sales 6 and 7 of Silverstein's appraisal are the same properties. Taking an average of these five sales, we arrive at a price of $7.85 per square feet. We are reluctant to disregard using adjusted sales prices because of lack of identifiable adjustments by Silverstein. However, we find that given the variety of sales used by both appraisers, and recognizing that Silverstein has selected lower priced comparables and Hagearty has selected higher priced comparables, we have a balanced spectrum of sales CT Page 15518 to consider. We note that Hagearty's finding of $8.50 per square foot using comparables that have been adjusted is higher than our use of comparables from both appraisers without adjustments. This gives us some comfort in using unadjusted comparables to find value. Finding that the site contains a total of 629,441 square feet, as determined by the assessor, using a price of $7.85 per square foot of land, we find the site value as of October 1, 1990 was $4,941,111.
Silverstein and Hagearty both undertook to value the subject property as a megaplex theater rather than valuing the property based upon the addition of the Builder's Square building value plus the added value of the new construction. In determining the value of the subject building, Silverstein and Hagearty used the Marshall Valuation Service, a nationally recognized cost estimating guide. Silverstein arrived at a cost new estimate of the replacement building to be $6,541,516 as of October 1, 1990. (Plaintiff's exhibit A, p. 65.) Hagearty, on the other hand, arrived at a cost estimate of the replacement building to be $10,081,962 as of October 1, 1990. (Defendant's exhibit 1, p. 64.) Silverstein selected the category of "Average Quality Class C Cinema" in the Marshall Valuation Service. Hagearty selected the category of "Good Quality Class C Cinema."
We find that it is more credible to use Hagearty's selection of "Good Quality Class C Cinema" in Marshall Valuation Service in developing the cost estimates to replace the subject building rather than use Silverstein's selection of "Average Quality Class C Cinema." As we have previously noted, Silverstein recognized that the subject building was a "new, state of the art cinema. (Plaintiff's exhibit A, p. 94.) The Builders Square building was converted to a megaplex theater with the expenditure of $5,300,000 in addition to the cost to originally construct the Builders Square building in 1992. The subject building was not a typical average quality theater as determined by Silverstein with a replacement value of $6,541,516. In our view it is more credible to select "Good" rather than "Average" in defining the category used in Marshall Valuation Service to value the subject building.
This difference in selecting the type of classification amounts to $25.30 per square foot of building. (See defendant's exhibit 1, p. 57.) The cost for Good Quality Class C Cinema per square foot is $85.62; the cost for Average Quality Class C Cinema per square foot is $60.32. $25.30 per square foot multiplied by the 90,000 square foot building gives us the sum of $2,277,000 as the difference between "Average" versus "Good" quality using the Marshall Valuation Service.
Based on the use of "Good" rather than "Average" in the Marshall Valuation Service, we find it more credible to use Hagearty's cost CT Page 15519 estimate of the replacement building. One part of Hagearty's replacement cost that we cannot accept is his valuation of adjusted site improvements at $587,302. We find more credible Silverstein's adjusted site improvements value of $367,071 because a number of site improvements listed by Hagearty are accounted for in the building value. This leaves us with Hagearty's adjusted total replacement cost new as of October 1, 1990 of $10,081,962 for the building, plus Silverstein's adjusted total depreciated cost of the site improvements of $367,071. To reach the depreciated value of the building, we deduct 20% of $10,081,962 for functional obsolescence to arrive at a final depreciated value of the building of $8,065,570. We then add Silverstein's depreciated cost of the site improvements of $367,071 to Hagearty's depreciated cost of the building to arrive at a total depreciated value of the building and improvements of $8,432,641 as of October 1, 1990. (See Defendant's exhibit 1, p. 64.)
Another measure of the difference between Silverstein and Hagearty is the calculation of the cost of the building in relation to the cost per screen and cost per seat using the Marshall Valuation Service. Silverstein concluded that the cost per screen was $408,845. Multiplying this figure by the sixteen screens in the theater results in a total value based upon a cost per screen analysis of $6,541,520. Silverstein's valuation on a per seat basis was arrived at by multiplying a cost per seat of $1819 by 3597 seats to arrive at a total cost of $6,542,943. Hagearty, on the other hand, selected a per screen value of $666,829. Multiplying this figure by the sixteen screens results in a total value based upon a cost per screen analysis of $10,669,264. Hagearty's valuation on a per seat basis was arrived at by multiplying a cost per seat of $2966 by 3597 seats to arrive at a total cost of $10,668,702. Each appraiser seemed to select a price per screen and a price per seat that closely supported their own finding of value based on a price per square foot of building space. However, the Marshall Valuation Service is not a credible guide to use in determining the fair market value of a theater based on the cost per screen or the cost per seat. Marshall Valuation Service recites, under the section Churches, Theaters and Auditoriums, relating to costs per screen and cost per seat, "[t]he following rules of thumb should not be used for actual appraisals, but should be considered rough budgeting guides and checks only." (Plaintiff's exhibit A, p. 2 of Addendum on Marshall Valuation Service.)
Using the approach taken by both appraisers, which was to value the whole property as of October 1, 1998 but trended back to October 1, 1990, we find, as we have previously determined, that the land value of all three lots is $4,941,111. Using the land value of $4,941,111, we add the depreciated value of the building and site improvements of $8,432,641 to arrive at a value of $13,373,752. The reason that we use the CT Page 15520 depreciated value of all improvements at $8,432,641 is because we find Hagearty's method of valuing the construction costs of the building less functional obsolescence more credible than Silverstein's method.
The assessor's finding of fair market value of the land and building on the grand list of October 1, 1998 trended back to October 1, 1990 was $13,207,229. This amount compares favorably with our finding that the fair market value of the subject property was $13,373,752 as of October 1, 1990. Under these circumstances we cannot find that the plaintiff is aggrieved by the action of the assessor.
Accordingly, judgment may enter in favor of the defendant dismissing this appeal without costs to either party.
Arnold W. Aronson Judge Trial Referee